# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TAMMY JO LONG, an Illinois resident, and LUXURY PROPERTIES LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) | Case No. 17-cv-02756 |
| BANK OF AMERICA, N.A., | ) ) ) | Judge Jorge L. Alonso |
| Defendant. | ) ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

July 7, 2017

Stephen J. Brown (#6257366)
Bevin Brennan (#6271982)
John S. Delnero (#6195914)
PEDERSEN & HOUPT
161 North Clark Street, Suite 2700
Chicago, Illinois 60601
(312) 641-6888
sbrown@pedersenhoupt.com
bbrennan@pedersenhoupt.com
jdelnero@pedersenhoupt.com

**TABLE OF CONTENTS**

Page(s)

Introduction ........................................................................................................................... 1

BACKGROUND FACTS ....................................................................................................... 1

    I.   Prior Bankruptcy Proceedings ................................................................................... 1

    II.  2014 Issues with Banks ............................................................................................. 4

    III. The Plaintiffs' Short Respite from Bank Problems ................................................... 5

    IV. BofA Rebuffs Any Efforts to Correct Its Reporting ................................................. 5

    V.  Plaintiffs' Damages from BofA's Conduct ............................................................... 7

Argument ............................................................................................................................... 7

    I.   The Bankruptcy Code Does Not Preempt the Claims. ............................................... 8

    II.  The FCRA Does Not Preempt Breach of Contract Claims ...................................... 13

    III. The Breach of Contract Claim Is Sufficient. ........................................................... 14

    IV. Plaintiffs Can Bring an Independent, Private Cause of Action for a Violation of the
        Confirmation Order IN THIS COURT. .................................................................... 16

        A.   This Court Can Adjudicate the Claim for a Breach of the Confirmation Order. ....... 16

        B.   BofA Has Violated the Confirmation Order ............................................................. 22

    V.  Punitive Damages Can Be Awarded Here. .............................................................. 24

    VI. The Declaratory Judgment Claim in Count IV Stands. ............................................ 25

Conclusion ........................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2009) ....................................................................7

*Causay v. Wells Fargo Bank, N.A.*, No. 16-cv-7398, 2016 U.S. Dist. LEXIS 171206 (N.D. Ill. Dec. 12, 2016) ................................................................................................13

*Cox v. Zale Del., Inc.*, 239 F.3d 910 (7th Cir. 2001) ...............................................................12

*Day v. Chevron U.S.A.*, 1:10-cv-01320-RLY-MJD, 2011 U.S. Dist. LEXIS 112178 (S.D. Ind. Sept. 29, 2011) ............................................................................................26

*Diamante v. Solomon & Solomon, P.C.*, No. 1:99-CV-1339, 2001 U.S. Dist. LEXIS 14818 (N.D.N.Y. Sept. 18, 2001) ..........................................................................12

*Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) ....................................8

*Enodis Corp. v. Empire. Ins. (In re Consol. Indus.)*, 360 F.3d 712 (7th Cir. 2004) ...................19

*Exchange Nat'l Bank v. Loma Plastics, Inc.*, No. 90 C 0164, 1990 U.S. Dist. LEXIS 2972 (N.D. Ind. Mar. 15, 1990) ...........................................................................9

*FCC v. Airadigm Communs.*, 616 F.3d 642 (7th Cir. 2010) ....................................................11

*Gates v. Didonato (In re Gates)*, No. 04-12076-SSM, 2004 Bankr. LEXIS 2303 (Bankr. E.D. Va. Oct. 20, 2004) ..............................................................................20

*Hukic v. Aurora Loan Servs.*, No. 05 C 4950, 2007 U.S. Dist. LEXIS 64629 (N.D. Ill. Aug. 31, 2007) ...13

*Huon v. Denton*, 841 F.3d 733 (7th Cir. 2016) .........................................................................7

*In re Castle Home Builders, Inc.*, 520 B.R. 98 (Bankr. N.D. Ill. 2014) ....................................24

*In re Chicago, Rock Island Pacific R.R.*, 794 F.2d 1182 (7th Cir. 1986) ...................................9

*In re Dendy*, 396 B.R. 171 (Bankr. D.S.C. May 5, 2008) .........................................................23

*In re Depew*, 115 B.R. 965 (Bankr. N.D. Ind. 1990) ...............................................................9

*In re Ernst,* 45 B.R. 700 (Bankr. D. Minn. 1985) ....................................................................8

*In re Jordan Mfg.*, 138 B.R. 30 (Bankr. C.D. Ill. 1992) ..........................................................9

*In re Kmart*, 359 B.R. 189 (Bankr. N.D. Ill. 2005) ................................................................17

*In re Penrod*, 169 B.R. 910 (Bankr. N.D. Ind. 1994) ..............................................................9

*In re Pettibone Corp.,* 935 F.2d 120 (7th Cir. 1991) ...............................................9, 10, 11, 22

*In re Rhodes*, 563 B.R. 380 (Bankr. M.D. Fla. 2017) ..............................................................24

*In re Shape (Brandt v. Swisstronics, Inc.)*, 135 B.R.707 (Bankr. D. Me. 1992) ........................10

*In re Xonics, Inc.*, 813 F.2d 127 (7th Cir. 1987) .....................................................................9

*In the Matter of FedPak Systems*, 80 F.3d 207 (7th Cir. 1996) ...............................................17

*Johnston v. Valley Credit Servs., Inc. (In re Johnston)*, No. 05-6288, 2007 Bankr. LEXIS 1174 (Bankr. N.D. W. Va. Apr. 12, 2007) ..............................................................20

*Mogg v. Midwest Collection Servs. (In re Mogg)*, No. 05-34066, 2007 Bankr. LEXIS 3086 (S.D. Ill. Sept. 5, 2007) ................................................................................................................................23

*MSR Exploration v. Meridian Oil*, 74 F.3d 910 (9th Cir. 1996) .................................................10

*Orius Corp. v. Quest Corp.*, 373 B.R. 555 (N.D. Ill. 2007) ........................................................20

*Twomey v. Ocwen Loan Servicing, LLC*, No. 16-cv-0918, 2016 U.S. Dist. LEXIS 111307 (N.D. Ill. Aug. 22, 2016) ................................................................................................................12

*Volling v. Kurtz Paramedic Servs.*, 840 F.3d 378 (7th Cir. 2016) ................................................8

*Wagner v. Ocwen Federal Bank*, No. 99 C 5404, 2000 U. S. Dist. LEXIS 12463 (N.D. Ill. Aug. 29, 2000) ................................................................................................................9, 10, 12

*Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012) ................................................10

*Workman v. GMAC Mortg. LLC (In re Workman)*, 392 B.R. 189 (Bankr. D.S.C. 2007) ...........24

*Zerand-Bernal Group v. Cox*, 152 B.R. 927 (Bankr. N.D. Ill. 1993) .........................................17

## Statutes

11 U.S.C. § 1123(a)(5)(B) ..............................................................................................................3

28 U.S.C. § 1334(b) ....................................................................................................................17

28 U.S.C. § 1452(a) ....................................................................................................................19

28 U.S.C. § 151 ...........................................................................................................................17

28 U.S.C. § 157(d) ......................................................................................................................18

28 U.S.C. § 158(a) ......................................................................................................................18

## Other Authorities

*Collier on Bankruptcy, Sixteenth Edition, Chapter 11, ¶ 1142.04[2]* ......................................17

*Collier on Bankruptcy, Sixteenth Edition, Chapter 3¶ 3.07* ......................................................19

## Rules

Bankruptcy Rule 9027(a)(3) .........................................................................................................19

Plaintiffs Tammy Jo Long and Luxury Properties LLC (together with Ms. Long, the "Plaintiffs"), by and through their undersigned counsel, hereby submit their Opposition to Defendant Bank of America, N.A.'s Motion to Dismiss Pursuant to Rule 12(b)(6) and state as follows:

## INTRODUCTION

Rather than acknowledging in any way shape or form its own breaches and misconduct, Defendant Bank of America (**"Bank of America"** or **"BofA"**) in some instances asserts that the Bankruptcy Code somehow precludes it from any liability for its wrongful actions, yet in virtually the same breath states that Plaintiffs cannot base any claims on Bankruptcy Code violations either. Bank of America essentially asks this Court to follow it down a zigzagging path where it can creatively use the law to immunize itself from any actions regardless of its actions in the Bankruptcy Court and its contractual agreement. Bank of America's 28-page brief is exactly the type of behavior that led to this lawsuit in the first place: a sense of entitlement to do whatever it wants with respect to small businesses and regular people and face no repercussions for its actions. No legal theory apparently can possibly stick to BofA.

Fortunately, the law does not permit Bank of America's bob-and-weave style tactics. Plaintiffs have stated claims against Bank of America, and the Court should deny the Motion to Dismiss with respect to Counts I and IV-VI. With respect to Count II and III for defamation, Plaintiffs will voluntarily dismiss them without prejudice.

## BACKGROUND FACTS

### I.   PRIOR BANKRUPTCY PROCEEDINGS

In 2011, Ms. Long and her then closely-held company Castle Home Builders, Inc. both filed for protections under Chapter 11 of the United States Bankruptcy Code (the **"Bankruptcy Code"**). (Compl. ¶ 14.) Prior to the bankruptcies, Ms. Long had operated a hospitality

company that owned many buildings, all subject to separate mortgages. (*Id.* at ¶ 15.) Unfortunately, by 2011, Ms. Long's personal assets and debts had become intermingled with her company's commercial assets and debts. (*Id.*)

The chapter 11 proceedings were fully adjudicated before the Bankruptcy Court for the Northern District of Illinois (Judge Jacqueline Cox presiding). (*Id.* at ¶ 16.) Ms. Long's personal bankruptcy case was number 11-19484, and that of her company was number 11-19428. The two cases were jointly administered, with all material filings taking place on the docket for case number 11-19428. (*Id.*) The Bankruptcy Court confirmed twin Chapter 11 plans of reorganization for Ms. Long and her prior business on June 13, 2013. (*Id.* at ¶ 19.) Later, the Bankruptcy Court entered a new confirmation order on August 9, 2013 to correct a technical problem with the first confirmation order. (*Id.*) The August 9, 2013 confirmation order was therefore effective *nunc pro tunc* to June 13, 2013. (*See* Case No. 11-19428 (Bankr. N.D. Ill.) Dkt. No. 360 ("**Bankr. Ct. Dkt.**")). (Compl. ¶ 19.)

One of the purposes of the confirmed plans of reorganization was to separate Ms. Long's residential mortgage on her personal home in Hinsdale, Illinois from her other mortgages for commercial properties. (*Id.* at ¶ 20.) A second goal of the bankruptcies was to change the financial terms of many of the mortgages on the business real estate operated by the hospitality business. (*Id.*) BofA voted in favor of the proposed plans and the changes these plans made to BofA's mortgages during the Chapter 11 proceedings. (*Id.* at ¶ 21.)

The Confirmation Order approved the jointly administered Plans of Reorganization for Plaintiffs. [Banker Ct. Dkt. No. 360.] Those plans include the following terms (among others):

- The Debtor has substantially reduced and reamortized their primary cost -- mortgage payments -- through this Reorganization Case and has taken other actions that the Debtor believes has improved its business and profitability sufficient to continue the business as well as make the payments required under the Plan. (*Id.* Ex. A § 8.1; *see also* Ex. B § 8.1 (similar language).)

- The Reorganized Debtor, and only the Reorganized Debtor, will be responsible for making all payments under this Plan, consistent with 11 U.S.C. § 1123(a)(5)(B). (*Id.* Ex. A § 2.1; Ex. B § 2.1.)

- Once confirmed and consummated, the end result of this Plan will be a Reorganized Debtor operating all seven Business Properties, holding title to all seven Business Properties and paying all business debts. (*Id.* Ex. A § 2.1; *see also* Ex. B § 2.1 (similar language).)

With respect to the Captain's View Property mortgage (the specific property at issue in this litigation ("**Captain's View**")), the Second Amended and Restated Plan of Reorganization for Tammy Jo Long [Bankr. Ct. Dkt. No. 360] specifically provided the terms for the reorganized mortgage with BofA. (Ex. B § 5.1 at 15-16.) In fact, BofA mortgages comprised their own class in the plan. (*Id.*) BofA agreed to new terms for the Captain's View property:

> BofA has agreed that the newly amortized mortgage for Captains View will be at $425,000, consistent with the property's current value. Interest will be capitalized as of the Effective Date, and first payments of principal and interest will begin in the first full month following the month in which the Effective Date falls. As with all newly recast mortgages, a 10 year re-amortization will apply. …. Both of these properties are "Business Properties," and, accordingly, the responsibility for making future payments under this Plan shall belong exclusively to the Reorganized Debtor and shall not be the personal liability of Ms. Long. *Id.* at 16.

As a result of the bankruptcies, Ms. Long's residential mortgage remained in her own name, but all of the other mortgages for commercial properties exited the bankruptcy with a new mortgagor/borrower, Co-Plaintiff Luxury Properties (the "**Reorganized Debtor**"). (Compl. ¶ 22.) The reorganized mortgages now have different interest rates, different amortization schedules, a new legal borrower entirely distinct from the old borrower, and different principal amounts than the pre-bankruptcy mortgages. (*Id.* at ¶ 23.)

Since the bankruptcy confirmation order was entered, neither Ms. Long nor the Reorganized Debtor has ever missed a mortgage payment. (*Id.* at ¶ 24.) No party has ever accused Ms. Long of violating the plans of reorganization. (*Id.*)

## II. 2014 ISSUES WITH BANKS

After the confirmation of the plans, many of the prior mortgage creditors continued billing for the old pre-bankruptcy mortgages, under the old pre-bankruptcy names and the old financial terms. (*Id.* at ¶ 25.) It was as if the bankruptcy had not happened — despite the fact that they had voted for the plans of reorganization. (*Id.*)

Eventually, the Reorganized Debtor brought claims for sanctions against nearly all of its mortgagee banks and servicers (including BofA) for knowing violations of bankruptcy law, of the terms of a confirmed plan of reorganization, and of the court's order confirming the plans. (*See* Bankr. Ct. Dkt. No. 372.) (Compl. ¶ 27.)

BofA soon reached out and agreed to change its behavior and settle the matter. (*Id.* at ¶ 28.) As stated in the Notice of Limited Withdrawal, the parties agreed to settle the matter and entered into a Settlement Agreement in July of 2014. (*Id.*)

At the time of the filing of the Complaint in this case, out an abundance of caution, Plaintiffs did not quote the exact language of the Settlement Agreement because of a confidentiality provision. (*Id.*) The Court ordered that the Settlement Agreement be filed publicly, and Plaintiffs can now cite directly the relevant provision. It is Section I.E, which provides:

> Releasors and their counsel will not, directly or indirectly, make any negative or disparaging statements against the Releasees maligning, ridiculing, defaming or otherwise speaking ill of the Releasees, and their business affairs, practices and policies, standards, or reputation (including but not limited to statements or postings harmful to the Releasees' business interests, reputation or good will) in any form (including but not limited to orally, in writing, on social media, internet, to the media, persons and entities engaged in radio, television or internet broadcasting, or to persons and entities that gather or report information on trade and business practices or reliability) that relate to this Agreement (as defined above) and the factual allegations made in the Litigation or any matter covered by the release within this Agreement. Nothing in the Agreement shall, however, be deemed to interfere with each party's obligation to report transactions with the appropriate governmental, taxing and/or registering agencies.

(Mem. Ex. A)

## III.    THE PLAINTIFFS' SHORT RESPITE FROM BANK PROBLEMS

After reaching settlements with all but one of the offending banks and servicers and receiving a favorable judgment against the remaining one in 2014, Ms. Long and Luxury Properties seemingly had finally obtained the relief that the Bankruptcy Code and the plans of reorganization were supposed to afford them. (Compl. ¶ 31.) Instead of receiving bills for the pre-bankruptcy loan for the Captain's View Property, the Reorganized Debtor properly received loan statements from BofA for the Captain's View property that generally conformed to the terms of the Reorganization Plans and also to the Settlement Agreement. (*Id.* at ¶ 32.) The bankruptcy cases closed in 2015. (Bankr. Ct. Dkt. Nos. 484-85.)

At the beginning of 2016, however, BofA slipped back into its old wrongful mode of behavior.  (Compl. ¶ 36.)  Despite not submitting any invoices or other documentation about any pre-bankruptcy loan or contending that the Reorganized Debtor is delinquent in any way on the Captain's View loan, BofA inexplicably has begun issuing false reports about Ms. Long and Luxury Properties. (*Id.*)

First, BofA now consistently and routinely disseminates false reports to at least one credit reporting agency stating that Ms. Long has filed a new bankruptcy. (*Id.* at ¶ 37.)  Ms. Long has not filed any bankruptcy case since the joint cases were filed in 2011. (*Id.*)   Second, BofA reports the Luxury Properties' loan as "delinquent." (*Id.* at ¶ 38.)  Third, BofA at times falsely reports that foreclosure proceedings have been initiated on properties held in the name of Luxury Properties. (*Id.* at ¶ 39.) Fourth, BofA falsely reports that loan payments have been missed on its loan and that the account is past due.  (*Id.* at ¶ 40.)

## IV.    BoFA REBUFFS ANY EFFORTS TO CORRECT ITS REPORTING

Plaintiffs' attorney repeatedly attempted to contact BofA about its false reporting and

violations of its contract. (*Id.* at ¶ 41.) In addition to other efforts, Plaintiffs' attorney sent certified mail to BofA to the address for legal notices provided on its loan documentation. (*Id.* at ¶ 42-44.) BofA only responded to this correspondence three and a half months later, on March 17, 2017. (*Id.* at ¶ 44.) But that letter only stated that BofA could not provide any substantive response without a separate written authorization from Ms. Long. (*Id.*)

In an act particularly telling about BofA's practices and handling of this loan, BofA stated:

> Should you wish for us to respond to your correspondence, please fax the aforementioned written authorization to my attention at fax number 1.704.625.5628, no later than March 22, 2017. Please note, if the required authorization is not received by the stated due date, we will not be able to respond to the inquiries and our file will be closed. (*Id.* at ¶ 45; *id.* Ex. 6.)

That is, if Plaintiffs' counsel did not include a signed authorization in response to a letter mailed on a Friday by the following Wednesday, BofA would not provide any response, would not engage in any discussion and would close the file. (*Id.* at ¶ 46.) That would then necessitate another inquiry by Plaintiffs' lawyer, which BofA would in all likelihood then ignore for another three or more months, all the while continuing its harmful reporting against Plaintiffs. (*Id.* at ¶ 46.) The March 22, 2017 letter conspicuously does not contain a phone number or an e-mail address at which to contact the author, further complicating any communications. (*Id.*)

The unfairness and irrationality of this approach is clear. (*Id.* at ¶ 47.) It is not inconceivable that a letter mailed on a Friday may not even arrive by a Wednesday, nor is it impossible that either Plaintiffs' attorney or Plaintiffs would be unavailable in a three-day span. (*Id.*) BofA's response shows that it had no serious intention of addressing these issues prior to the filing of this lawsuit. (*Id.*)

Plaintiffs' counsel did provide the requested authorization by March 22, 2017. (*Id.* at ¶ 48.) BofA still did not respond prior to the filing of the Complaint on April 11, 2017, almost

three weeks later. (*Id.*)

## V.  PLAINTIFFS' DAMAGES FROM BoFA'S CONDUCT

Ms. Long subscribes to a credit watch service that routinely informs her of reports involving her credit, includes reporting by BofA. (*Id.* at ¶ 50.) Ms. Long learned of BofA's false reporting through these reports. (*Id.*; *id.* Group Ex. 7.) Before BofA's false reporting restarted in 2016, Ms. Long's personal credit rating was being rehabilitated and was climbing. (*Id.* at ¶ 51.) Her credit rating had risen approximately 56 points from August 2015 to August 2016. (*Id.*) This positive direction, however, has been reversed since the start of BofA's false reporting, and it is back to about where it started. (*Id.*) No other events explain the recent fall in Ms. Long's credit score. (*Id.*)

Ms. Long has recently had two credit applications declined, with the issuers not even allowing her a low credit limit based on her credit reporting. (*Id.* at ¶ 52.) She has also had numerous conversations with bankers who have informed her that, given her credit status, she is ineligible to receive any loans that may otherwise be refinancing options. (*Id.*) Having spent hundreds of thousands of dollars in the chapter 11 bankruptcy proceedings in order to obtain a "fresh start" and reorganize her company, and having never missed a payment under her confirmed Chapter 11 bankruptcy plans, Ms. Long and her businesses now face many of the same economic problems as before the bankruptcies due to BofA's false reporting. (*Id.* at ¶ 53.)

## ARGUMENT

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint need only contain enough factual content to 'state a claim to relief that is plausible on its face.'" *Huon v. Denton*, 841 F.3d 733 (7th Cir. 2016), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2009). "A complaint has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Volling v. Kurtz Paramedic Servs.*, 840 F.3d 378 (7th Cir. 2016),

quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). "The requirement of facial plausibility means

'enough to raise a right to relief above the speculative level.'" *Diedrich v. Ocwen Loan*

*Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016), quoting *Twombly*, 550 U.S. at 555. Detailed

factual allegations are not required; a complaint is sufficient if it does not contain just "labels and

conclusions" and "a formulaic recitation of elements of a cause of action." *See Huon*, 841 F.3d

at citing *Iqbal*, 556 U.S. at 678. The Court must consider the complaint in the light most

favorable to Plaintiffs and accept all well-pleaded facts as true. *See Huon*, 841 F.3d at "[A] well-

pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is

improbable, and that a recovery is very remote and unlikely." *Diedrich*, 839 F.3d at 589.

"[E]ven with the heightened pleading requirements of *Iqbal* and *Twombly*, the pleading

requirements to survive a challenge to a motion to dismiss remain low." *Id.*

## I.  THE BANKRUPTCY CODE DOES NOT PREEMPT THE CLAIMS.

BofA cannot skirt liability by asserting that the claims are preempted by the Bankruptcy

Code. (Mem. at 4-5.) *In re Ernst*, 45 B.R. 700 (Bankr. D. Minn. 1985), is an often-cited case

setting forth in great narrative detail how and where a confirmed chapter 11 plan can be

subsequently enforced and what effect confirmation actually has on third parties. As the court

noted in *Ernst*:

> The effect of confirmation is to discharge the entire preconfirmation debt,
> replacing it with a new indebtedness as provided in the confirmed plan. The plan
> is essentially a new and binding contract, sanctioned by the Court, between a
> debtor and his preconfirmation creditors. [citation omitted]  Retention by the
> Bankruptcy Court of jurisdiction in the case post-confirmation merely continues
> availability of the Court as a forum for resolution of questions regarding
> administration of the plan and disputes that might arise under it. *But it is not in all*
> *instances the only forum available to interested parties.*
>
> Unless the matter at issue is within the exclusive jurisdiction of the Bankruptcy
> Court, the mere reservation of jurisdiction in the case by the Bankruptcy Court
> post-confirmation does not foreclose the right of a party to seek his remedy upon

default under the plan in a state court having jurisdiction over the subject matter of the dispute. Furthermore, since the confirmed plan represents a new indebtedness, neither the § 362 stay nor § 524 injunction applies and no relief need be obtained from the Bankruptcy Court prior to the commencement of the state court action.

*Id.* at 702 (emphasis added).

*Ernst* therefore stands for the proposition that an ex-debtor seeking to enforce a chapter 11 plan, which the *Ernst* court called a "contract," can do so in a non-bankruptcy court, and can do so to obtain a "remedy upon default." *Id.* Here, just as in *Ernst,*[1] Plaintiffs' twin confirmed plans of reorganization reserved the Bankruptcy Court's ability to hear controversies such as this one, but did not create exclusive jurisdiction for the bankruptcy court. If fact, both plans expressly contemplate *that other courts* could hear enforcement actions. (*See* Compl. Ex. 1, Confirmation Order Ex. A Article 12 and Ex. B Article 12.) BofA voted for these plans containing these provisions. (Compl. ¶ 21.)

The controlling authority from the Seventh Circuit is in accord with *Ernst*:

Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm is also without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens. . . . Formerly a ward of the court, the debtor is emancipated by the plan of reorganization. A firm that has emerged from the bankruptcy is just like any other defendant in a tort case...

*In re Pettibone Corp.*, 935 F.2d 120 (7th Cir. 1991) (*citing to In re Xonics, Inc.*, 813 F.2d 127 (7th Cir. 1987) and *In re Chicago, Rock Island Pacific R.R.*, 794 F.2d 1182 (7th Cir. 1986).

In *Wagner v. Ocwen Federal Bank*, No. 99 C 5404, 2000 U. S. Dist. LEXIS 12463 (N.D. Ill. Aug. 29, 2000), the court held that the Bankruptcy Code did not preempt the plaintiff's Fair Debt Collection Practices Act and state law claims because the alleged wrongdoer only obtained

---

[1] *Ernst* has been cited to or followed by courts in the Seventh Circuit at least four times, including (1) *In re Penrod*, 169 B.R. 910 (Bankr. N.D. Ind. 1994); (2) *In re Jordan Mfg.*, 138 B.R. 30 (Bankr. C.D. Ill. 1992), (3) *In re Depew*, 115 B.R. 965 (Bankr. N.D. Ind. 1990); and (4) *Exchange Nat'l Bank v. Loma Plastics, Inc.*, No. 90 C 0164, 1990 U.S. Dist. LEXIS 2972 (N.D. Ind. Mar. 15, 1990).

assignment of its position *after* the bankruptcy discharge. 2000 U.S. Dist. LEXIS 12463, at *1-3 (concluding that the plaintiff "has not attempted to bypass any remedies available to her under the Code while the bankruptcy was pending" because she "had no real way of bring [the wrongdoer] into the bankruptcy case while it was pending."). Just as in *Wagner*, Plaintiffs here are not attempting to bypass anything. In fact, recourse to the Bankruptcy Court in this instance would be more difficult here because it would require reopening old bankruptcy cases. This is a claim based on contractual duties that do not arise from the Bankruptcy Code. A plaintiff bringing a state or federal claim merely connected to a closed bankruptcy proceeding is generally no longer capable of "preempting" bankruptcy law because bankruptcy law no longer controls. *Pettibone*, 935 F.2d at 122.

Preemption of a federal law over a state law normally requires express preemption, so-called "field" preemption, or conflict preemption. *Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547 (7th Cir. 2012). In *Wigod*, the plaintiff sued a bank under various state-law based theories including breach of contract, fraudulent misrepresentation and violations of the Illinois Consumer Fraud Act. *Id.* The Seventh Circuit found no preemption in *Wigod*, and actually noted that where state-law based causes of action are brought to merely to enforce the same result dictated by federal statutes, there can be no preemption. *Id.* at 583.

The case law on which Bank of America relies is woefully inapplicable. Only two of the seven cases that BofA cites are even chapter 11 cases. (*See* Mem. at 5-6, citing *In re Shape (Brandt v. Swisstronics, Inc.)*, 135 B.R.707 (Bankr. D. Me. 1992) and *MSR Exploration v. Meridian Oil*, 74 F.3d 910 (9th Cir. 1996).) The rest are all chapter 13 or chapter 7 cases. Significant differences exist between chapter 11 bankruptcies and other types of bankruptcy such as chapter 7 or 13. These differences are highly relevant to any analysis of what types of causes

of action may be brought against a party alleged to have violated a confirmed chapter 11 plan of reorganization or its related contracts.

In Chapter 7 and 13 cases, vulnerable individual debtors often involved in those proceedings need the seamless protection of a court that is specially trained with respect to principles applicable to individuals, to smaller retail debts, and to residential mortgages. These cases often involve payments on cars, trucks, houses, or trailer homes. Chapter 13 trustees often track monthly payments made under plans, and then discharge is only granted after the plan is complete. The dollar amounts involved in such cases are often relatively small. To maintain protections for less sophisticated debtors, bankruptcy courts often maintain longer oversight of chapter 7 and 13 proceedings.

In contrast, the debtors and creditors involved in a chapter 11 are normally more sophisticated than those involved in chapter 7 or 13. Chapter 11 cases normally end with newly negotiated contracts to be performed and maintained by the parties, not with injunctions to be enforced by the court. There is no need, in a chapter 11, for a sophisticated debtor to continue to behave as a "ward" of the bankruptcy court for the reasons explained by Judge Posner in *Pettibone*. A chapter 11 bankruptcy plan is just a court-imposed contract—unlike a 524 "discharge" injunction—and can be read using generic principles applicable to all contracts. *FCC v. Airadigm Communs.*, 616 F.3d 642 (7th Cir. 2010). Chapter 11 proceedings are therefore quite different in having lesser continuing oversight by the Bankruptcy Court.

BofA cites two chapter 11 cases that involve issues that arose during the ongoing proceedings. *See In re Shape*, 135 B.R. at 708-709 (deciding whether a state-law based action could be brought while the bankruptcy was still ongoing and whether sanctions were appropriate for a violation of the automatic stay); *MSR Exploration*, 74 F.3d at 912 (finding that the plaintiff (debtor) should have brought claims based on creditor's actions during the bankruptcy

proceeding rather than waiting to bring a separate malicious prosecution action). Of course if a claim arose during the bankruptcy proceedings, then a party should raise the issue in that court. That is not at all like this situation, where the claims against BofA have arisen long after the confirmation of the plan and the closure of the bankruptcy case.

The other cases that BofA cites regarding discharge are inapposite. *See Cox v. Zale Del., Inc.*, 239 F.3d 910 (7th Cir. 2001) (the only remedy in a chapter 7 case for a violation of a discharge injunction is to seek sanctions from the bankruptcy court); *Twomey v. Ocwen Loan Servicing, LLC,* No. 16-cv-0918, 2016 U.S. Dist. LEXIS 111307 (N.D. Ill. Aug. 22, 2016) (addressing chapter 13 discharge injunction and a state statute the directly competed with the bankruptcy code); *Diamante v. Solomon & Solomon, P.C.*, No. 1:99-CV-1339, 2001 U.S. Dist. LEXIS 14818 (N.D.N.Y. Sept. 18, 2001) (discussing effect of a chapter 13 discharge order).

The confirmation orders that BofA is accused of violating were only created at the end of the two and a half year long chapter 11 proceedings. The Settlement Agreement that BofA is accused of violating was entered into in July of 2014, over a year after the bankruptcy confirmation hearing in June of 2013. The bankruptcy cases were closed in March 2015. BofA's actions here that give rise to these claims occurred after the bankruptcy cases closed and as late as 2016. Just as in *Wagner*, Plaintiffs have no way of seeking Bankruptcy Court sanctions for BofA's second bout of flouting the law, started in 2016, over three years after the confirmation hearing in the relevant bankruptcies and a year after the bankruptcy cases closed.

What the case law shows is that a plaintiff can pursue individual actions in the District Court when a chapter 11 case is closed, a plan has long been confirmed and the claims are not in violation of a discharge injunction. Here, Plaintiffs' twin chapter bankruptcies concluded long ago, and long before the violations alleged in the Complaint. Plaintiffs could not have brought BofA's 2016 violations to the attention of a Bankruptcy Court that confirmed plans in 2013 and

closed the cases in 2015. Finally, there is no bankruptcy provision or remedy that is more specifically applicable to these alleged facts. There can be no preemption here.

## II. THE FCRA DOES NOT PREEMPT BREACH OF CONTRACT CLAIMS.

Despite BofA's Settlement Agreement, it shockingly asks this Court to find that the non-disparagement terms that it expressly agree to cannot be enforced because any such contract claim is preempted by the Fair Credit Reporting Act (**"FCRA"**). (Mem. at 7-9.) This is beyond reasonable.

The court in *Causay v. Wells Fargo Bank, N.A.*, No. 16-cv-7398, 2016 U.S. Dist. LEXIS 171206 (N.D. Ill. Dec. 12, 2016) very recently rejected this argument after a thorough analysis of the FCRA. Following the statute and case law with respect to preemption of other state law claims arising by statute or common law, the court expressly held that the FCRA did not preempt a breach of contract claim because in that instance, the parties agreed to certain obligations. State law did not impose any obligation or requirement on them.

BofA really stretches to state that because Illinois law is required to "enforce" the contract, that somehow the claim is preempted. (Mem. at 9.) This is exactly what the *Causay* court rejected: the FCRA preempts claims where a state law imposes the requirement or obligation, but not those where only the remedy arises under state law.

The *causay* court's extensive analysis makes more sense than the more limited holding in *Hukic v. Aurora Loan Servs.*, No. 05 C 4950, 2007 U.S. Dist. LEXIS 64629 (N.D. Ill. Aug. 31, 2007). The majority of the preemption analysis in *Hukic* where the court found preemption of part of the breach of contract claim discusses tortious interference claims. 2007 U.S. Dist. LEXIS 64629, at *33-36. There is no analysis whatsoever of why preemption would apply to a contract claim. The analysis in *Causay* is the full and logical analysis.

Parties are free to enter contracts as long as they do not violate public policy. There is no argument whatsoever that an agreement not to disparage another violates public policy. Parties are certainly free to enter contracts where they agree that other parties will not engage in certain behavior, including what they say to a credit reporting agency, and then what contractual remedies would be available. One could certainly envision a contract where the parties agree on the exact language to be reported to a credit agency. [2]

Accepting BofA's position would lead to an untenable result: a party like BofA could ostensibly enter into an agreement with a party regarding non-disparagement and reporting obligations (as it did here) and then, when it violates that provision, assert in any legal proceeding (as it did here) that it has no obligation and cannot be bound in any event. This is beyond absurd. Parties can enter into agreements extending or modifying statutory obligations. That is what is at issue, and the FCRA in no way preempts that ability.

### III. THE BREACH OF CONTRACT CLAIM IS SUFFICIENT.

BofA's first argument that the breach of contract claim fails to the extent that it is based on implied terms or the implied covenant of good faith and fair dealing is easily refuted: this is not Plaintiffs' position. (Mem. at 9-10.)[3] BofA has breached an actual term of the Settlement Agreement, namely the Non-Disparagement provision.

The parties agree on what is required to state a claim for a breach of contract: (i) there exists an enforceable contract; (ii) Plaintiffs performed their obligations under it; (iii) Defendant breached an obligation under the contract; and (iv) Plaintiffs suffered proximate damages as a result of Defendant's breach. (Mem. at 11.) BofA initially argues that Plaintiffs cannot state a claim without alleging which provision was breached. (Mem. at 11.) As explained in the

---

[2] Bank of America discloses a split among courts. The better view is that contracts are enforceable for the reasons explained in this section, *Causay* and the cases cited therein. (Mem. at 7.n2; *id.* at 8 n.3.)

[3] *Causay* expressly declined to decide whether the FCRA preempts breaches of implied terms of contracts. 2016 U.S. Dist. LEXIS 1712016, at *16. (Mem. at 9.)

Complaint, however, at the time of filing, Plaintiffs were precluded from referencing or quoting the specific provision because of the confidentiality provision contain in the Settlement Agreement. (Compl. ¶ 28.) Out of an abundance of caution (and to avoid being accused of wrongdoing by BofA), Plaintiffs did not cite or quote the relevant provision in the initial Complaint. Should it be necessary, now that the Settlement Agreement may be publicly disclosed, Plaintiffs can amend the Complaint to identify and more fully include the relevant Non-Disparagement provision.

BofA's other two arguments to try to wiggle out of its contractual obligations fail. First, BofA appears to claim that because the Non-Disparagement provision does not expressly reference "negative credit reporting" or "obligation in reporting to credit bureaus," that somehow this provision is inapplicable. (Mem. at 12.) Second, it argues that the entire provision is unenforceable if it precludes BofA's ability to "report the status of the Loan to credit bureaus." (*Id.* at 13.) Then, BofA makes the amazing argument that the obligation to report to credit bureaus precludes enforcement of the entire Non-Disparagement provision as a matter of public policy. (*Id.*)

Plaintiffs have never claimed or contested that BofA, as a continuing loan provider, can provide information to credit reporting bureaus if that information is up-to-date and accurate. That is what the last line of the Non-Disparagement provision provides:

> Nothing in the Agreement shall, however, be deemed to interfere with each party's obligation to report transactions with the appropriate governmental, taxing and/or registering agencies. (Mem. Ex. A § I.E.)

The issue, however, is that BofA is not reporting the accurate and current status of the Loan to credit bureaus. (Mem. at 12.) Instead, it has reverted to reporting old, outdated and incorrect information as it had been doing before the Settlement Agreement. The Non-Disparagement provision was included as an agreement to stop this behavior. It precludes BofA

from making statements "*maligning*, ridiculing, *defaming* or otherwise speaking ill of the Releasees, and their business affairs." (Mem. Ex. A § I.E (emphasis added).) False information necessarily maligns and defames. This is not a dispute about whether BofA could report information if it was current and accurate but happened to be negative. BofA posits a scenario about what might happen if Plaintiffs did miss a payment or fall into default. (Mem. at 13.) That is a diversion, another effort by BofA to try to avoid its own agreement. The allegations in this case involve reporting of information that is not current or correct, and which BofA agreed years ago to cease reporting to credit bureaus (and which it did for a few years).

BofA's efforts to contort Plaintiffs' allegations into a speculative future event or simply a claim about "negative" reporting is incorrect: BofA has made disparaging and false statements to the credit bureaus about a loan based on information covered by the Settlement Agreement in violation of the Non-Disparagement provision. That is a quintessential breach of contract claim, and it survives BofA's attempt to recharacterize it.

## IV. PLAINTIFFS CAN BRING AN INDEPENDENT, PRIVATE CAUSE OF ACTION FOR A VIOLATION OF THE CONFIRMATION ORDER IN THIS COURT.

### A. This Court Can Adjudicate the Claim for a Breach of the Confirmation Order.

BofA argues in Section II of its brief that no cause of action is available in this Court (*i.e.* sanctions) for violations of chapter 11 reorganization plans that were confirmed by this own Court's bankruptcy "unit." (Mem. at 14.) Instead, BofA argues—somewhat strangely but with admirable candor—that Plaintiffs should have and could have sought sanctions against it in the Bankruptcy Court. (*Id.*) According to BofA, a motion for sanctions before the Bankruptcy Court would have been appropriate but a cause of action brought to this Court was not. *Id.* This argument is consistent with BofA's general "shell game" defense, in which Plaintiffs' choices of

court and choice of remedy are always wrong, preempted, unavailable, or otherwise improper, regardless of BofA's actions.[4]

The Bankruptcy Court for the Northern District of Illinois is a "unit" of this Court and bankruptcy judges are "judicial officers" of the district court to which they are attached. 28 U.S.C. § 151. If Plaintiffs had gone to the Bankruptcy Court first to enforce the confirmed plan instead of coming to this Court, surely BofA would have argued (this time with some authority), that Plaintiffs could have only come here first. After all, bankruptcy courts possess only rapidly waning jurisdiction over an ex-debtor's affairs after confirmation. *See, e.g., In re Kmart*, 359 B.R. 189 (Bankr. N.D. Ill. 2005). Under 28 U.S.C. § 1334(b), bankruptcy courts retain jurisdiction over matters that are "related to" a confirmation plan. *Id.* Fearing, however, that "related to" jurisdiction would create a permanent and sweeping federal jurisdiction, the Seventh Circuit has created bright line tests for when "related to" jurisdiction ends. Absent an impact upon the administration of a plan of reorganization, parties have no standing to invoke a bankruptcy court's limited post-confirmation jurisdiction. *See Zerand-Bernal Group v. Cox*, 152 B.R. 927 (Bankr. N.D. Ill. 1993). The Seventh Circuit requires courts to consider whether the dispute would affect the amount of property available for distribution under the plan to creditors to determine whether the matter belongs in Bankruptcy Court. *In the Matter of FedPak Systems*, 80 F.3d 207 (7th Cir. 1996). The treatise *Collier* concurs:

> If the issue affects only third parties, or involves only the debtor and a third party on a matter not critical to the plan, the matter is typically best resolved by a nonbankruptcy court. After confirmation, the plan essentially functions as a contract between the debtor and the other entities affected by the plan, and there is nothing amiss in a nonbankruptcy court interpreting the provisions of the plan.

> *Collier on Bankruptcy, Sixteenth Edition, Chapter 11,* ¶ 1142.04[2]

---

[4] The bankruptcy cases are closed and have been since 2015. Surely if Plaintiffs had filed a motion to reopen the bankruptcy case under section 350(b), with no success promised in that endeavor, BofA would have opposed that action too.

The dispute in this case involves BofA's clear violation of both the letter and spirit of Plaintiffs' confirmed plans of reorganization. Such violations materially harm Plaintiffs, but do not affect the payouts available to other creditors under such plans, which have been mostly completed. The bankruptcy proceedings have been closed since 2015. This dispute is not the type that would trigger bankruptcy court jurisdiction under *Zerand* and *FedPak* because it does not affect the resources available under the confirmed plans available to pay creditors. This is a dispute between just two parties.

This Court, not the Bankruptcy Court, is where this dispute belongs under *Zerand* and *FedPak*. This Court is, moreover, already involved in this dispute because a confirmation order entered by this Court's own unit, the Bankruptcy Court for the Northern District of Illinois, has been violated. The allegations made can and should be the subject of a suit in this Court, regardless of what title or rubric is used to describe the remedy Plaintiffs seek.[5] Moreover, this Court may withdraw the reference from any bankruptcy court even before it renders a decision, in which case it again becomes a bankruptcy trial court of first resort. 28 U.S.C. § 157(d). Under these particular factual circumstances in which payments to innocent third parties under the plan are not imperiled, BofA fails to draw a valid line between the Bankruptcy Court and this Court.

In any event, BofA does not have a basis to seek dismissal of this cause of action, as the proper remedy would have been to seek to remove this case to the Bankruptcy Court, a right that BofA has waived. A federal statute creates the remedy for a party that is sued in a district court but feels that the suit should have only been brought in a bankruptcy court. That remedy is not a motion to dismiss before the district court, but rather a motion to direct the reference of the

---

[5] It is particularly telling that if Plaintiffs had theoretically gone first to the Bankruptcy Court, been theoretically displeased with the result it got there, and then appealed that result it would only end up right back where it had actually started from: here. This Court hears appeals taken from bankruptcy court decisions. 28 U.S.C. § 158(a).

matter to the bankruptcy court under 28 U.S.C. § 1452(a), which applies to removal actions from federal district court into the related bankruptcy court. *Collier on Bankruptcy, Sixteenth Edition, Chapter 3¶ 3.07.* The related notice must be filed under Bankruptcy Rule 9027(a)(3) within 30 days of receipt of service. BofA, in short, had a remedy here if it had really wanted to be in Bankruptcy Court, but slept on its rights. It cannot now move to dismiss based on arguments that Plaintiffs are in the wrong court or has used the wrong words for seeking a remedy for what has happened here.

If this Court would prefer that Plaintiffs bring their claim for sanctions via motion and not as a cause of action, they shall do so. (Mem. at 14-17.) Again, rubrics and titles should not dominate over substance. If Plaintiffs cannot obtain sanctions here, a Kafkaesque result is obtained in which the Bankruptcy Court no longer has jurisdiction, this Court cannot entertain a separate cause of action, and no motion for sanctions may be brought here. This is an absurd result. Substance prevails over form, and the remedy sought is available and ought to be so. Bank of America may seek an unjust and absurd result here, but this Court need not oblige the bank.

Next, BofA insists, wrongly, that a blanket rule precludes private causes of action in order to remedy violations of a bankruptcy court's confirmation order. (Mem. at 15-16.) An examination of what the case law actually says reveals a more nuanced reality. The one case upon which BofA relies much more than others is *Enodis Corp. v. Empire. Ins. (In re Consol. Indus.)*, 360 F.3d 712 (7th Cir. 2004), and accordingly an analysis of that case is particularly demonstrative that no such blanket rule exist. In *Consol*, the party who sought to bring a stand-alone lawsuit (but was refused by the court) was not a party to or mentioned in the order upon which it based its suit. *Id.* at 714. The very first sentence of the ruling reads "[t]his case presents the odd situation of one party suing another for contempt of a bankruptcy court order to which

neither was a party." *Id.* The failed would-be plaintiff in *Consol* also still had an active bankruptcy case on its hands and full access to the bankruptcy court when it nevertheless brought a law suit instead of a motion for sanctions. *Id.* at 715. Neither the would-be plaintiff nor the would-be defendant in *Consol* was the debtor. *Id.* Finally, the order that the would-be plaintiff claimed was violated was a garden-variety order lifting the automatic stay. *Id.* at 715. The appellate court's discussion in *Consol* of the ability to bring a cause of action for violation of a court order is limited to one cursory paragraph, which the court refers to as a mere "procedural problem" and not a jurisdictional one. *Id.* at 716.

*Consol*, therefore, is so factually inapplicable to this situation that it implicitly stands for the proposition that: (i) had the would-be plaintiff in *Consol* been a party to the violated court order; (ii) had either the would-be plaintiff or would-be defendant in *Consol* actually been the debtor; (iii) had the bankruptcy case been closed in *Consol* rather than still ongoing, such that no motion could be easily made; and (iv) had the violated court order in question been a weightier and more final order, then an independent lawsuit would have been warranted. What is clear is that under the right circumstances, lawsuits (and not motions) are routinely brought in connection with violations of discharge injunctions, and those lawsuits are entertained. *See e.g., Johnston v. Valley Credit Servs., Inc. (In re Johnston)*, No. 05-6288, 2007 Bankr. LEXIS 1174 (Bankr. N.D. W. Va. Apr. 12, 2007); *Gates v. Didonato (In re Gates)*, No. 04-12076-SSM, 2004 Bankr. LEXIS 2303 (Bankr. E.D. Va. Oct. 20, 2004).

For at least one Northern District of Illinois federal judge, the issue of deference to the Bankruptcy Court turned on how involved the Bankruptcy Court had been in writing and devising whatever court order is later claimed to have been violated. *See Orius Corp. v. Quest Corp.*, 373 B.R. 555 (N.D. Ill. 2007). In *Orius*, a litigant argued that the District Court should defer to a ruling of the Bankruptcy Court as to the terms of a stipulated order drafted by the

parties and approved by the Bankruptcy Court. *Id.* at 561, 566. The litigant argued that *Consol* required deference to the Bankruptcy Court's interpretation of its own orders, much like BofA argues here. *Id.* at 566. The court disagreed and refused to follow *Consol*, noting that the order in question had not been actually drafted by the Bankruptcy Court but rather by the parties. *Id.* at 566-67. The District Court Judge could read the bankruptcy order much like a contract, and as a matter of law, *de novo*.

Here, the twin-bankruptcy confirmation orders (attaching the plans of reorganization) are 57 pages long in the aggregate, and were drafted by counsel to the Plaintiffs. Such an order, referring as it does to attached plans for all of its detail [Banker. Ct. Dkt. No. 360], is intended to be a stand-alone document that does not refer to outside documents. The Bankruptcy Court has no special knowledge of the provisions of such document, nor could it, as it enters many such orders every year, and it focuses mostly on whether the tests for confirmation of a plan are met, not what the plan says. This Court should follow the well-reasoned opinion in *Orius*.

There is a qualitative difference between chapter 11 confirmation orders and other more technical orders that are used by courts merely to administer or end other types of bankruptcy cases. This is a primary reason why so much of the BofA's case law is inapposite. A chapter 11 confirmation order is written to exist outside of bankruptcy. Section 524 discharge orders, by contrast, are mostly intended for an audience of bankruptcy lawyers and judges. Chapter 11 confirmation orders are designed to be used by the debtor as a sort of financial "passport" or "walking papers" allowing them to navigate their reorganized existence well after the bankruptcy case closes. As the case law cited above expressly recognizes, chapter 11 confirmation orders are akin to court-imposed contracts, and can and should be enforced by *any court* that happens to become exposed to one in the context of a claim—there is no requirement that the aggrieved party return to the bankruptcy court. Quite the opposite, the Seventh Circuit has admonished ex-

debtors not to go running to the bankruptcy court every time "something unpleasant happens." *Pettibone*, 935 F.2d at 122.

By coming to this Court first under these circumstances, Plaintiffs are in compliance with *Pettibone* and its related cases. Since it will be in a fresh court anyway, a fresh cause of action would appear logical and optimal. A fresh cause of action, when facing a new court and a new judge, would appear to be a more apt procedural device for raising a claim of a violated confirmation order, given that a new court is unlikely to understand how it can grant a contempt motion related to an order that it did not enter. Courts are used to coming across new claims in the form of a new complaint, and not a motion arising from another court's order. Hence, the choice of the court determines to which degree the very same claim is called a "cause of action" or a "motion"—although the substance of the claim is the same regardless of what name is given. The Court here has jurisdiction to hear these claims.

### B. BofA Has Violated the Confirmation Order.

The terms of the Confirmation Order spell out that the mortgages at issue have been reduced and reamortized, and that these actions were done in order to improve and continue the business. (Bankr. Ct. Dkt. No. 360 Ex. A §§ 2.1, 8.1; Ex. B. §§ 2.1 and 8.1.) They also clearly state that any payment obligations belong only to the Reorganized Debtor. (*Id.* Ex. A §§ 2.1, 2.2, and 8.1; Ex. B. §§ 2.1, 2.2. and 8.1.) And BofA expressly agreed to the restructured loan terms for the Captain's View and other loans. (*Id.* Ex. B § 5.1.) Despite these requirements, acknowledgements, and agreement, BofA's actions disavow the existence of the Confirmation Order or its terms. Instead, BofA has acted as if the Confirmation Order does not exist and that the terms of the Captain's View mortgage have not been modified. BofA acts as if Ms. Long is personally liable for the Captain's View loan, despite the express terms of the Confirmation

Order to the contrary. It has deprived Plaintiffs of the entire purpose of the Confirmation Order and plans of reorganization, namely to continue and improve the business.

BofA cites a host of cases in the context of a discharge injunction. (Mem. at 21-22.) Those cases are inapposite to the circumstances here. As an initial matter, the claim is not based on a violation of a discharge injunction, thereby distinguishing all of case Defendant cites. (Mem. at 21-23.) In addition, this is not a case where the reporting at issue was done pre-petition, pre-confirmation, or pre-discharge and was just never changed. (Mem. at 21-22, citing, *e.g., Mogg v. Midwest Collection Servs. (In re Mogg)*, No. 05-34066, 2007 Bankr. LEXIS 3086 (S.D. Ill. Sept. 5, 2007) and *In re Dendy*, 396 B.R. 171 (Bankr. D.S.C. May 5, 2008). This is an entirely different situation: BofA agreed to change the terms of the mortgage, modified its credit reporting, and then reverted to reporting old, outdated and false information years later. This is not a question of whether there was an obligation to correct what was already out there. Instead, BoA chose to begin reporting false information anew. This is patently a violation of the confirmation order.[6]

BofA is not in compliance with the requirements of the Confirmation Order through its actions that ignore its very existence. Even one of the cases BofA cites was express that it "does not hold that the failure to release a void lien *or the failure to correct a credit report* would, in all instances, not be a violation of the discharge injunction or the confirmation order." *In re Dendy*, 396 B.R. at 183. By failing to follow the terms of the Plan regarding the restructured

---

[6] BofA's tangent about what Plaintiffs could have done is alarming yet predictable. Rather than admit that BofA could and should have corrected its false reporting, it once again tries to hide behind other methods to place the onus on somebody else. (Mem. at 23-24.) It also intentionally obscures BofA's behavior by conspicuously omitting that it did not respond to Plaintiffs' November 1, 2016 correspondence until March 17, 2017. (*Id.*) Yet somehow, Plaintiffs apparently should be faulted for only waiting three weeks to file this lawsuit after finally receiving a dismissive response to an inquiry made over four months before. (Mem. at 24.) BofA's tactics could not be more clear: never respond or correct its behavior, yet claim that Plaintiffs should wait forever as their damages to their businesses piles up. This is beyond belief, yet only bolsters the allegations in the Complaint.

obligations of the Captain's View loan, and providing misinformation contrary to the Confirmation Order to the detriment of Plaintiffs, BofA is in violation of the Confirmation Order.

## V.    PUNITIVE DAMAGES CAN BE AWARDED HERE.

Punitive damages are available for a violation of a confirmation order. *See, e.g., In re Rhodes*, 563 B.R. 380 (Bankr. M.D. Fla. 2017); *Workman v. GMAC Mortg. LLC (In re Workman)*, 392 B.R. 189 (Bankr. D.S.C. 2007). The violations forming the basis of Plaintiffs' claims do not involve the mortgage servicer failing to bill the prepetition mortgage while the bankruptcy proceedings remained open. (Mem. at 24, citing *In re Castle Home Builders, Inc.*, 520 B.R. 98 (Bankr. N.D. Ill. 2014).) These bankruptcy cases have closed, and BofA has started once again violating the Confirmation Order. Plaintiffs do not seek punitive damages based on a violation of a discharge injunction.

Punitive damages may be appropriate where the defendant violates a confirmation order depending on the conduct. *Rhodes* is particularly instructive, as it involved a home mortgage company that "is a sophisticated company with a sizeable amount of experience concerning bankruptcy law and procedure, and an active participant in this Court and bankruptcy courts across the nation." 563 B.R. at 391. That court's holding applies with equal force to BofA here:

> The inability to comply with the Confirmation and Sale Orders for over two years despite numerous requests by the Debtor is inconceivable and reprehensible. Nationstar's failure to provide any reasonable explanation or mitigating circumstance for its clear disregard of this Court's orders or the Debtor's numerous pleas for assistance astounds and shocks the Court. The Court simply cannot condone or excuse. *Id.* at 592.

Like BofA here, the defendant in *Rhodes* deprived the plaintiff of the "fresh start" that is supposed to accompany bankruptcy. *Id.* As described at length in the Complaint, BofA's actions are unwarranted and their failures to even consider addressing them (further emphasized

by the arguments made in the Motion to Discuss) shows that punitive damages are available to Plaintiffs.

## VI. THE DECLARATORY JUDGMENT CLAIM IN COUNT IV STANDS.

BofA's sole argument with respect to Count IV is that it apparently adds nothing more to the other counts. (Mem. at 26-27.) This is not true. The prior counts address claims for actual damages based on BofA's conduct. The declaratory judgment count is necessary as this is a ripe dispute that is ongoing. In the past and with its oversized memorandum in support of its Motion to Dismiss where BofA tries every possible avenue to dodge any liability for its misconduct, BofA has shown that it is unwilling to resolve these issues and cease and desist from continuing to violate its court-mandated and contractual allegations to not report false and disparaging information about Plaintiffs. Without a declaration and related relief to forestall continuing violations, Plaintiffs would be without an adequate remedy.

BofA never contends that Plaintiffs have not stated a claim for declaratory relief. Rather, BofA contends that the court should exercise its "discretion" and leave Plaintiffs without any recourse whatsoever. (*Id.* at 26.) It is emblematic of the circles in which BofA asks this Court to run: dismiss the declaratory judgment count because it is duplicative, and then also dismiss it because the other legal theories posited by Plaintiffs fail as well. (*Id.* at 26-27.) The Court should not countenance BofA's continued efforts in this Court and others to be allowed to treat its customers in any way it wants and yet leave them with no potential recourse.

Plaintiffs have stated a claim for declaratory relief. BofA's response shows that there are ripe issues for dispute over the proper application of the Settlement Agreement and the order confirming the plans of reorganization. In addition, as discussed in detail above, Plaintiffs do have surviving underlying claims, showing that a declaration would be proper relief.

Finally, for the reasons discussed above, this Court, and not the Bankruptcy Court, is the proper forum. In the only case cited by Defendant for the notion that this Court would improperly consider a declaratory judgment count, *Day v. Chevron U.S.A.*, 1:10-cv-01320-RLY-MJD, 2011 U.S. Dist. LEXIS 112178 (S.D. Ind. Sept. 29, 2011), that court found that there was no actual ripe dispute between the parties and that it was better addressed in the initial forum of New York, not Indiana. There is no question that this dispute is ripe, and Plaintiffs have sought recourse in the same court system.

The declaratory judgment count in Count IV should stand.

## CONCLUSION

For all of the reasons in this Memorandum, any further submissions to this Court and any oral argument, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6) with respect to Counts I and IV-VI and dismiss without prejudice Counts II-III and grant all other just relief.

Respectfully submitted,


By:    /s/ Stephen J. Brown


Stephen J. Brown
Bevin Brennan
John Delnero
Pedersen & Houpt
Attorneys for Plaintiffs
161 N. Clark Street, Suite 2700
Chicago, Illinois, 60601
Telephone: 312.261.2184
sbrown@pedersenhoupt.com
bbrennan@pedersenhoupt.com
jdelnero@pedersenhoupt.com